NORTHFIELD TRUST COMPANY *v.* RAYMOND CUTTING ET AL. AND DIRECTOR GENERAL OF RAILROADS, TRUSTEE.

February Term, 1921.

Present: WATSON, C. J., POWERS, TAYLOR, and MILES, JJ., and FISH, Supr. J.

Opinion filed October 4, 1921.

*Trustee Process—Liability of Director General of Railroads As Trustee—Liability of Trustee Determined by Facts At Time of Trial—Interest on Account Trusteed—Custom Relied On As Defence Must Be Proved.*

1. While trustee process operates as an attachment of the fund pending the determination of liability, as to the trustee, it is primarily an action *in personam*, brought in the plaintiff's name in the right of the defendant, and not a "levy" within section 10 of the Federal Control Act; and the Director General of Railroads is subject to such process to reach credits in his hands for loss of freight and freight overcharges, and to judgment if found indebted.

2. If, at the time the Director General was summoned as trustee, such credits were exempt under his General Order No. 43, forbidding the bringing of trustee process, he became chargeable as trustee on the revocation of the order before trial; the liability of one summoned as trustee being determined according to the state of facts at the time of trial.

3. If, at the time of the service of the process on the trustee, the debt attached is one on which the principal defendant can demand

interest, the running of the interest is not interrupted by such service.

4. If a custom that freight claims against a railroad are non-interest bearing is relied upon as a defence to interest charges, such custom must be proved by the party claiming it.

ACTION OF CONTRACT in which the Director General of Railroads was summoned as trustee. Trial by Court at the September Term, 1919, Washington County, *Butler,* J., presiding. Judgment for the plaintiff against the principal defendant and the trustee. The trustee excepted. The opinion states the case.

*Wm. R. McFeeters* for the trustee.

*Edward H. Deavitt* for the plaintiff.

TAYLOR, J.   Before the service of the writ in this case, the United States Railroad Administration, in charge of the Director General of Railroads, was indebted to the defendant, Raymond Cutting, on claims for loss of freight and freight overcharges aggregating $1,691.52, which accrued about March 1, 1918, and had become liquidated at the time of service. The plaintiff summoned the Director General of Railroads as trustee. The suit having been discontinued as to all of the defendants except Raymond Cutting, the plaintiff had judgment against him as principal defendant. On the question of the trustee's liability, it was agreed that the right against him, if any, arose during the period of Federal control of railroads; and there was no dispute as to the amount due, except as to the matter of interest. The trustee seasonably objected to the jurisdiction of the court, but on disclosure and hearing it was adjudged that the trustee was chargeable, and judgment was entered against him for $1,872.98 as of February 1, 1920, which included interest on the sums due the defendant. Briefly stated the trustee objected to the judgment (1) on the ground that the court had no power to allow interest after the date of the service of the writ; (2) because at the time of service the statutes of the United States and the proclamation of the President and orders of the Director General of Railroads made thereunder did not authorize, but, on the contrary, prohibited, the trusteeing of funds in the hands of the Director General. The case is here on exceptions by the trustee.

The more important question presented is whether the court had jurisdiction to render judgment against the trustee. This depends upon the effect to be given the statutes, proclamation, and orders referred to above. By the Act of Congress of August 29, 1916, the President, in time of war, is empowered, through the Secretary of War, to take possession and assume control of any system or systems of transportation, or any part thereof, and to utilize the same, to the exclusion as far as may be necessary of all other traffic thereon, for the transfer or transportation of troops, war material and equipment, or for such other purposes connected with the emergency as may be needful or desirable. Pursuant to this act, the President, by proclamation on the 26th day of December, 1917, assumed control of the railroads of the United States, and appointed William G. McAdoo, the then Secretary of the Treasury, and designated him to be the Director General of Railroads, by and through whom the possession, control, operation, and utilization of such transportation systems undertaken by the President were to be exercised. The proclamation provided: "Said Director * * * may perform the duties imposed upon him, so long and to such extent as he shall determine, through the board of directors, receivers, officers, and employees of said systems of transportation. Until and except so far as said Director * * * shall, from time to time, by general or special orders, otherwise provide, the board of directors, receivers, officers, and employees of the various transportation systems shall continue the operation thereof in the usual and ordinary course of business of common carriers, in the names of their respective companies." It further provided: "Except with the prior written assent of said Director, * * * no attachment by mesne process or on execution shall be levied on or against any of the property used by any of said transportation systems in the conduct of their business as common carriers; but suits may be brought by and against said carriers and judgment rendered as hitherto until and except so far as said Director * * * may, by general or special orders, otherwise determine."

On March 21, 1918, an act, generally known as the Federal Control Act, was passed by Congress, which in detail recited how the control of transportation systems previously granted the President should be exercised. Differences of opinion had already arisen as to the status of the transportation systems, and

of the persons and corporations engaged in the business of transportation, affecting liability for occurrences in the course of their operation under Federal control.   To meet this situation, section 10 of the Act of March 21, 1918, was enacted, which in part provides as follows: "Carriers while under Federal control shall be subject to all laws and liabilities as common carriers, whether arising under state or Federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such Federal control or with any order of the President.   Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defence shall be made thereto upon the ground that the carrier is an instrumentality or agency of the Federal government.   Nor shall any such carrier be entitled to have transferred to a Federal court any action heretofore or hereafter instituted by or against it, which action was not so transferable prior to the Federal control of such carrier; and any action which has heretofore been so transferred because of such Federal control or of any act of. Congress or official order or proclamation relating thereto shall upon motion of either party be retransferred to the court in which it was originally instituted. But no process, mesne or final, shall be levied against any property under such Federal control. * * * Nothing in this act shall be construed to amend, repeal, impair, or affect the existing laws or powers of the states in relation to taxation or the lawful police regulations of the several states, except wherein such laws, powers, or regulations may affect the transportation of troops, war materials, government supplies, or the issue of stocks and bonds."

On September 5, 1918, the Director General of Railroads issued "General Order No. 43," which, after certain recitations, provided: "It is therefore ordered that no moneys or property under Federal control or derived from the operation of carriers while under Federal control shall be subject to garnishment, attachment, or like process in the hands of such carriers or any of them, or in the hands of any employee or officer of the United States Railroad Administration."   The recitals contained in the order show that its purpose was to safeguard the wages of employees from garnishee process while in the possession of the Federal Administrator, as such practice was prejudicial to the

operation of the transportation systems. General Order No. 43 was in force when the trustee process was served, but had been revoked by General Order No. 43A, which took effect May 15, 1919, before the case came to hearing on the trustee's disclosure.

We look to General Orders No. 50 and No. 50A for the interpretation put upon section 10 of the Federal Control Act by the Executive Department. General Order No. 50, issued October 28, 1918, by Mr. McAdoo, the then Director General, after referring to section 10 of the Act of March 21, 1918, recites: "Whereas since the Director General assumed control of said systems of transportation, suits are being brought and judgments and decrees rendered against carrier corporations on matters based on causes of action arising during Federal control for which the said carrier corporations are not responsible, and it is right and proper that the actions, suits, and proceedings hereinafter referred to, based on causes of action arising during or out of Federal control, should be brought directly against said Director General of Railroads, and not against said corporations: * * * It is therefore ordered that actions at law, suits in equity, and proceedings in admiralty hereafter brought in any court, based on contract, binding upon the Director General of Railroads, claim for death or injury to persons, or for loss and damages to property, arising since December 31, 1917, and growing out of the possession, use, control, or operation of any railroad system of transportation by the Director General of Railroads, which action, suit, or proceeding, but for Federal control, might have been brought against the carrier company, shall be brought against William G. McAdoo, Director General of Railroads, and not otherwise; provided, however, that this order shall not apply to actions, suits, or proceedings for the recovery of fines, penalties, and forfeitures. Subject to the provisions of General Orders numbered 18, 18a, and 26, heretofore issued by the Director General of Railroads, service of process in any such action, suit, or proceeding may be made upon operating officials operating for the Director General of Railroads the railroad or other carrier in respect of which cause of action arises, in the same way as service was heretofore made upon like operating officials for such railroad or other carrier company."

General Order No. 50A, issued January 11, 1919, by the trustee as Director General, is similar in all material respects. The explanation of the purpose of the original order and its

effect upon litigation is to be found in a statement by the then
Director General before the Interstate Commerce Committee of
the United States Senate in April, 1919, from which we quote:
''At this point I want to refer to General Order No. 50.  That
refers to suits against the Director General.  There, again, we
had a situation which was developing confusion.  Of course,
General Order No. 50 is designed to deal with certain classes of
causes of action that arise against the government while the
government is in control of the railroads—causes of action for
which the government is liable and for which the corporation is
not liable.  Claims were beginning to be made in various parts'
of the country that the corporation itself was not liable for a
cause of action arising against the government while it was in
control, and plaintiffs were being embarrassed because they were
not certain where they were going to come out if they sued the
corporation.  It seemed a reasonable rule, and really in the
interests of plaintiffs—and it did not have any relation to any-
thing else or cause any disturbing factors—to provide that where
these causes of action arose against the government, in effect that
suits should be brought against the Director General.  It still
left the plaintiffs free to sue just as they could sue before, and
to make service of process on the local railroad agents just as
they could make it before.  It did not, as we see it, impair the
rights of plaintiffs at all, but it cleared up the situation by mak-
ing it perfectly clear that they would have a procedure that
would be free from attack.''

At the time this case was argued considerable doubt existed
as to the force and effect of section 10 of the Federal Control Act
and the orders of the Director General respecting the subject-
matter thereof.  The cases, both state and Federal, involving
these questions, were many, and were in hopeless disagreement.
However, the decision by the Supreme Court of the United States
in *Missouri Pacific R. Co.* v. *Ault,* 256 U. S. 554, 65 L. ed. 1087,
41 Sup. Ct. 593, handed down June 1, 1921, has set the more
difficult questions at rest.   Some of the claims made by the
trustee in his brief would not now be relied upon in view of this
decision.  The case was in error to the Supreme Court of the
state of Arkansas to review a judgment in favor of the plaintiff
in an action to enforce a statutory penalty against a railway
company and the Director General of Railroads.  The statute in
question provided that whenever a railroad company, or a re-

ceiver operating a railroad, discharged an employee, with or without cause, it should pay him his full wages within seven days thereafter; and that if payment was not duly made, then as a penalty for such nonpayment the wages of such employee should continue from the date of discharge, or refusal to further employ, at the same rate until paid. ` The defendant in error had judgment in the lower court for $50 as debt and $390 as penalty. This judgment was affirmed by the Supreme Court of Arkansas. 140 Ark. 572, 216 S. W. 3.

Mr. Justice Brandeis, speaking for the Court, says: "The President had taken possession and control of the Missouri Pacific Railroad on December 28, 1917, pursuant to the Proclamation of December 26, 1917, 40 Stat. at L. 1733, under the Act of August 29, 1916, chap. 418, 39 Stat. at L. 619, 645, Comp. Stat. § 1974a. He was operating it through the Director General under the Federal Control Act (March 21, 1918, chap. 25, 40 Stat. at L. 451. Comp. Stat. § 3115¾a, Fed. Stat. Anno. Supp. 1918, p. 757) when Ault was employed, when he was discharged, and when the judgment under review was entered. See Transportation Act 1920, Act of February 28, 1920, chap. 91, 41 Stat. at L. 456. The company had claimed seasonably that under the acts of Congress it could not be held liable either for the wages or the penalty; and that, if the state and Federal statutes should be construed as creating such liability, they were in that respect void as to it under the Federal Constitution. The Director General did not contest liability for wages actually due, but claimed that, under the legislation of Congress, he was not liable for the penalty, and that the state statute, as applied to him, was void under the Federal Constitution. The claims of both defendants having been denied by the highest court of the state, they brought the case here by writ of error.

"First. The company is clearly not answerable in the present action if the ordinary principles of common-law liability are to be applied. The Railroad administration established by the President in December, 1917, did not exercise its control through supervision of the owner-companies, but by means of a Director General, through 'one control, one administration, one power for the accomplishment of the one purpose, the complete possession by governmental authority to replace for the period provided the private ownership theretofore existing.' *Northern P. R. Co.* v. *North Dakota,* 250 U. S. 135, 148, 63 L. ed. 897, 902, P. U. R.

1919D, 705, 39 Sup. Ct. 502. This authority was confirmed by the Federal Control Act of March 21, 1918, chap. 25, 40 Stat. at L. 451, and the ensuing Proclamation of March 29, 1918, 40 Stat. at L. 1763. By the establishment of the Railroad Administration and subsequent orders of the Director General, the carrier companies were completely separated from the control and management of their systems. Managing officials were 'required to sever their relations with the particular companies and to become exclusive representatives of the United States Railroad Administration.' U. S. R. R. Adm. Bulletin No. 4, pp. 113, 114, 313. The railway employees were under its direction, and were in no way controlled by their former employers. See Bulletin No. 4, p. 168; section 5, page 198 *et seq.*, p. 330 *et seq.* It is obvious, therefore, that no liability arising out of the operation of these systems was imposed by the common law upon the owner-companies, as their interest in and control over the systems were completely suspended.''

Referring to the contention that the provision of section 10 of the Federal Control Act made the company liable for the acts or omissions of the Director General in operating the Missouri Pacific Railroad, the opinion continues: ''The plain purpose of the above provision was to preserve to the general public the rights and remedies against common carriers which it enjoyed at the time the railroads were taken over by the President, except in so far as such rights or remedies might interfere with the needs of Federal operation. The provision applies equally to cases where suits against the carrier' companies were pending in the courts on December 28, 1917, to cases where the cause of action arose before that date and the suit against the company was filed after it, and to cases where both cause of action and suit had arisen or might arise during Federal operation. The government was to operate the carriers, but the usual immunity of the sovereign from legal liability was not to prevent the enforcement of liabilities ordinarily incident to the operation of carriers. The situation was analogous to that which would exist if there were a general receivership of each transportation system. Operation was to be continued as theretofore, with the old personnel, subject to change by executive order. The courts were to go on entertaining suits and entering judgments under existing law, but the property in the hands of the President for war purposes was not to be disturbed. With that exception, the substantial

legal rights of persons having dealings with the carriers were not to be affected by the change of control. This purpose Congress accomplished by providing that 'carriers while under Federal control' should remain subject to all then existing laws and liabilities, and that they might sue and be sued as theretofore. Here the term 'carriers' was used as it is understood in common speech, meaning the transportation systems, as distinguished from the corporation owning or operating them. * * * It is this conception of a transportation system as an entity which dominates section 10 of the act. The systems are regarded much as ships are regarded in admiralty. They are dealt with as active, responsible parties, answerable for their own wrongs. But since levy or execution upon their property was precluded as inconsistent with the government's needs, the liability of the transportation system was to be enforced by allowing suit to be brought against whomever, as the party operating the same, was legally responsible under existing law, although it be the government. Thus under section 10, if the cause of action arose prior to government control, suit might be instituted or continued to judgment against the company as though there had been no taking over by the government, save for the immunity of the physical property from levy and the power of the President to regulate suits in the public interest as by fixing the venue, or the time for trial. If the cause of action arose while the government was operating the system, the 'carrier while under Federal control' was nevertheless to be liable and suable. This means, as a matter of law, that the government or its agency for operation could be sued, for under the existing law the legal person in control of the carrier was responsible for its acts. See *Gracie* v. *Palmer,* 8 Wheat. 605, 632, 633, 5 L. ed. 696, 703. The title by which suit should be brought—the person who should be named as defendant—was not designated in the act. In the absence of explicit direction, it was perhaps natural that those wishing to sue the carrier should have named the company as defendant when they sought to hold the government liable. It doubtless seemed, as suggested in *McNulta* v. *Lochridge,* 141 U. S. 327, 331, 332, 35 L. ed. 796, 799, 800, 12 Sup. Ct. 11, that suit should be brought against the transportation company 'by name ''in the hands of'' or ''in the possession of'' a receiver,' or Director General. All doubt as to how suit should be brought was cleared

away by General Order No. 50, which required that it be against the Director General by name.

"As the Federal Control Act did not impose any liability upon the companies on any cause of action arising out of the operation of their systems of transportation by the government, the provision in Order No. 50, authorizing the substitution of the Director General as defendant in suits then pending, was within his power, the application of the Missouri Pacific Railroad Company that it be dismissed from this action should have been granted, and the judgment against it should, therefore, be reversed."

In disposing of the claim that the Director General was liable for the penalty imposed by the Arkansas statute the Court says: "The contention * * * is rested specifically upon the clause in section 10, to the effect that the carriers 'shall be subject to all laws and liabilities as common carriers, whether arising under state or Federal laws or at common law,' and the provision in section 15, that the 'lawful police regulations of the several states' shall continue unimpaired. By these provisions the United States submitted itself to the various laws, state and Federal, which prescribed how the duty of a common carrier by railroad should be performed, and what should be the remedy for failure to perform. By these laws the validity and extent of claims against the United States arising out of the operation of the railroads were to be determined. But there is nothing, either in the purpose or the letter of these clauses, to indicate that Congress intended to authorize suit against the government for a penalty, if it should fail to perform the legal obligation imposed. The government undertook, as carrier, to observe all existing laws; it undertook to compensate any person injured through a departure by its agents or servants from their duty under such law; but it did not undertake to punish itself for any departure by the imposition upon itself of fines and penalties, or to permit any other sovereignty to punish it. * * * The purpose for which the government permitted itself to be sued was compensation, not punishment. In issuing General Order No. 50, the Director General was careful to confine the order to the limits set by the act. * * * Wherever the law permitted compensatory damages, they may be collected against the carrier while under Federal control. * * * But double damages, penalties and for-

feitures, which do not merely compensate but punish, are not within the purview of the statute.''

[1]   We have quoted thus at length from the opinion to show the comprehensive scope which the Court gives to section 10 of the Federal Control Act, as well as the care taken to point out that so far as the provisions of the Director General's orders are upheld, they are within the limits set by the act. In view of what is there said, there can be no doubt that it was not error· to hold the Director General liable as trustee, unless General Order No. 43 stood in the way of so doing. The point made that trustee process is expressly prohibited by the provision that ''no process, mesne or final, shall be levied against any property under Federal control,'' is not well taken. While such process operates as an attachment of the fund pending the determination of liability, as regards the trustee it is primarily an action *in personam,* brought in the plaintiff's name in the right of the defendant, and not a ''levy'' within the quoted provision of the Transportation Act. Hence the Director General is subject to such initial process, and to judgment if found indebted. *Hines* v. *Minor* (Ga. App.) 105 S. E. 851. We are not now concerned with questions which might arise after judgment. See *LeClair* v. *Montpelier & Wells River R. R.,* 93 Vt. 92, 101, 106 Atl. 587. Ample provision has been made by Congress for the payment of such judgments without resort to the levy prohibited by the statute.

The validity of General Order No. 43 while in force was assumed at the argument; but it may be doubted whether it could be upheld, at least so far as it undertook to forbid the bringing of trustee process on claims other than for employees' wages. It is fundamental that the power and authority of the Director General of Railroads cannot exceed that which could lawfully be vested in him by proclamation or order of the President, and he in turn receives his power and authority over the subject-matter here concerned by and through the acts of Congress empowering him to take control of and operate the transportation systems of the United States.      Whatever general language is used in the acts conferring authority upon the President must be construed as given for the purpose of enabling him to carry out their provisions, and not to enable him, either by himself or any appointee of his, to set aside any provision of the legislative will, or to take away any rights or privileges granted to or

recognized as validly existing in third persons by such legislation. The legislative declaration is the paramount authority and must control. *Franke* v. *Chicago & N. W. R. Co.*, 170 Wis. 71, 173 N. W. 701. ·

As construed by the Court in the Ault Case, section 10 of the Federal Control Act preserved to the public the rights and remedies enjoyed at the time the railroads were taken over by the President, except in so far as they might interfere with the needs of Federal operation. This indicates clearly how far the President or his representative was authorized to go in curtailing by general orders the remedies previously enjoyed by a creditor, which leaves the justification of General Order No. 43 to depend upon its necessity for carrying out the purposes for which the President was authorized to take over the railroad systems of the country. The reason assigned for making the order gave color of authority, if it had been confined to trustee process affecting employees' wages; but it is not apparent how the use of the process in other cases could in any way interfere with the operation of the railroads under Federal control.

[2]     But we do not find it necessary to rest the decision on this ground. If the validity of the order while in force were admitted, the result would be the same. G. L. 1937 provides that a person or corporation may be summoned as a trustee of the defendant, and the goods, effects, or credits of the defendant which are in the hands of such trustee at the time of the service of the writ upon him, "or which come into his hands or possession before disclosure," shall thereby be attached and held to respond to final judgment in the cause, except as elsewhere provided. The Director General was duly summoned as a supposed trustee. He then had in his hands credits of the defendant which, the order aside, were subject to attachment by such process. Subsequently, and before the question of his liability was before the court for determination, the disabling order was revoked. The credits, if before exempt, thereupon assumed a new character, and in legal effect came into his possession at that moment as attachable credits. This accords with the construction of the statute to be found in *Newell* v. *Ferris*, 16 Vt. 135, where it was said that the liability of the person summoned as trustee is determined according to the state of facts at the time of trial. *Spring* v. *Ayer*, 23 Vt. 516; *Seymour* v. *Cooper*, 25 Vt. 141. It is clear that the court did not err in holding the trustee

chargeable, which leaves for consideration the objection that interest should not have been included.

[3]    The record is meager, so far as it relates to the question of interest.   It states that the claimed liability of the trustee to the defendant arose by reason of the loss of certain goods consigned by defendant for shipment over the lines of the trustee and by reason of certain transportation charges, in excess of legal charges, which the defendant was obliged to pay; and that it was agreed that the right, if any, against the trustee arose after March 1, 1918, during the period of Federal control.   It is said in the brief for the trustee that it was agreed that the amount due on the first item of the disclosure was $1,577.89, described as ''amount of bill vouchered and held,'' and $113.63 on the second item, described as ''freight overcharges by Raymond Cutting (under investigation).''   The date to which the concession related does not appear, but it is admitted that at the time of service (January 29, 1919), the matters had been so far investigated that the claims were liquidated.   There is no express finding touching the matter of interest, but in the judgment rendered February 27, 1920, the court allowed interest on the claim for loss of freight from March 1, 1918, to February 1, 1920, thus treating the claim for loss of freight as bearing interest from the date of loss. .

It is argued that payment to the defendant was prevented by the trustee process, and that to charge the trustee with interest while the suit was pending would be to penalize him for obeying the process.   As to this, it is enough to say that payment into court of the sum due at the time of service would have relieved the trustee from further accumulation of interest.   While, as between the plaintiff and defendant, the trustee is a mere stake holder (*Lyman* v. *Orr*, 26 Vt. 119), the fact that he has been summoned as such does not change his liability respecting the payment of interest; nor should it, for the judgment against him as trustee is a discharge from a subsequent demand by the principal defendant.   G. L. 2008.   The attaching creditor takes the place of the principal defendant.   *Kettle* v. *Harvey*, 21 Vt. 301.   Whether a trustee is chargeable with interest depends upon whether the debt or claim attached is one on which the principal defendant could demand interest at the time of service of the trustee process.   If it is then interest-bearing because overdue, the running of interest is not interrupted by the service of such

process; but when the demand was not on interest when attached, and the trustee has received no interest on the fund, he is not liable for interest thereon while the demand is locked up by the trustee process. *Oakes* v. *Buckman,* 87 Vt. 187, 88 Atl. 736; *Platt* v. *Continental Ins. Co.,* 62 Vt. 166, 19 Atl. 637; *Baker* v. *Central Vermont Ry. Co.,* 56 Vt. 302; *Lyman* v. *Orr, supra.* Thus interest is properly allowed from the date of settlement on a claim payable immediately thereafter, though demand for payment is not made.     *Dunnett & Slack* v. *Gibson,* 78 Vt. 439, 63 Atl. 141.

[4]     As showing that the claim for loss of freight was not interest-bearing at the time of service on the trustee, we are asked to take notice of a custom in handling freight claims, said to be too well understood to need statement, of not allowing interest.     If the trustee relied upon such a custom to take the claim out of the ordinary rule respecting interest, it was incumbent upon him to show it.     The fact would be one of which the court would not take judicial notice.     It is axiomatic that on review reversible error must be made to appear.     It necessarily follows that the record must exclude every reasonable presumption in support of the judgment.     Whether the claim would or would not draw interest from the date of loss does not appear; but the shortage in the record is fatal, for we must presume in support of the judgment that the court found on sufficient evidence that it drew interest from that date.     The decision in *Missouri Pacific R. Co.* v. *Ault. supra,* removes any doubt as to the right to charge the Director General of Railroads with interest when he is summoned as trustee, the same as a private person. It is there held that the damages recoverable in a suit against him while in control of the railroads may reasonably include interest.

*Judgment affirmed.*