PUBLIC SERVICE COMMISSION, SECOND DISTRICT, Plaintiff, *v.* NEW YORK CENTRAL RAILROAD COMPANY, Defendant.

(Supreme Court, Albany Special·Term, July, 1920.)

Public Service Commissions Law, § 57 — summary proceedings under — when petition to make reduced rate will be denied — statutes — Transportation Act of February 28, 1920, § 208(a) (41 U. S. Stat. at Large, 456) — Railroad Law, § 57(5) — Interstate Commerce Act — Federal Control Act of March 21, 1920.

The Transportation Act of February 28, 1920, section 208(a), (41 U. S. Stat. at Large, 456), after declaring that "All rates, fares and charges  *  *  *  which on February 29, 1920, are in effect on the lines of carriers subject to the Interstate Commerce Act, shall continue in force and effect until thereafter changed by state or federal authority respectively or pursuant to authority of law," provides, "but prior to September 1, 1920, no such rate, fare or charge  *  *  *  shall be changed in such manner as to reduce any such rate, fare or charge, unless such reduction or change is approved by the commission." *Held,* that the two cents per mile rate for passengers on the New York Central railroad between Albany and Buffalo, as provided by section 57(5) of the Railroad Law, will not be restored automatically on September 1, 1920, but must be revived by new legislation.

The petition of the public service commission, second district, in a summary proceeding under section 57 of the Public Service Commissions Law, to enforce its order made June 15, 1920, directing said railroad company to restore the rate of fare provided by said section 57(5) of the Railroad Law, which rate was suspended by the institution of federal control of the railroad systems of the country, which began December 28, 1917, pursuant to the proclamation of the President and the Federal Control Act of March 21, 1918, and to make such reduced rate effective on and after September 1, 1920, will be denied and the proceeding dismissed.

SUMMARY PROCEEDING under section 57 of the Public Service Commissions Law to enforce the terms of an order made by said commission June 15, 1920.

**618**  Pub. Serv. Comm. *v.* N. Y. Central R. R. Co.

Supreme Court, July, 1920.          [Vol. 112.

Ledyard P. Hale, for Public Service Commission.

Wm. L. Visscher and Charles C. Paulding, for New York Central Railroad Company.

Hinman, J.  This is a summary proceeding under section 57 of the Public Service Commissions Law, begun by the public service commission, second district, against the New York Central Railroad Company, to enforce the terms of an order made by the said commission on the 15th day of June, 1920.

The order of the public service commission directed the New York Central Railroad Company to " restore the rate of fare for way passengers between Albany and Buffalo to 2¢ per mile as provided by section 57 of the Railroad Law of the state of New York, and make such reduced fare effective on and after September 1st, 1920," and " to that end file and amend the tariff accordingly at least thirty days before September 1st, 1920," and " perform any and all other acts necessary to provide for the charging and collecting of no more than 2¢ per mile for way passengers between such points from and after Sept. 1st, 1920."

The commission's order was based entirely upon the provisions of section 57 of the Railroad Law upon the theory that the defendant railroad was about to fail and omit to do a thing required of it by said section 57.

The jurisdiction of the commission to institute this proceeding is claimed to be under section 49 of the Public Service Commissions Law, upon the theory that there was a threatened violation of a provision of law.

The particular provision of section 57 of the Railroad Law covering the rate of fare involved herein is subdivision 5 of that section, which, after providing

generally for a three-cent rate of fare, restricts the New York Central Railroad Company for way passengers to a maximum rate of two cents per mile. This particular provision of the Railroad Law relates only to passengers between Albany and Buffalo, and has been in effect since 1853. Its operation was suspended by the institution of federal control of the railroad systems of the country which began on December 28, 1917, pursuant to the proclamation of the president and the Federal Control Act of March 21, 1918. 40 U. S. Stat. at Large, 451.

During this federal control all passenger fares, both interstate and intrastate, of the railroads under federal control were advanced to a basis of three cents per mile. This advance in rates became effective June 10, 1918, and became the lawful rates interstate and intrastate. *Northern Pacific R. Co.* v. *North Dakota,* 250 U. S. 135.

These rates continued in effect as the lawful rates during federal control and were in effect on February 29, 1920, the last day of federal control.

The question here is the interpretation of the Transportation Act of February 28, 1920 (41 U. S. Stat. at Large, 456) providing for the termination of federal control, the particular section interpreted being section 208 (a), which reads as follows:

" *Existing rates to continue in effect.*

" Sec. 208 (a) : All rates, fares, and charges, and all classifications, regulations, and practices, in anywise changing, affecting, or determining, any part or the aggregate of rates, fares, or charges, or the value of the service rendered, which on February 29, 1920, are in effect on the lines of carriers subject to the Interstate Commerce Act, shall continue in force and effect until thereafter changed by State or Federal authority, respectively, or pursuant to authority of law; but

prior to September 1, 1920, no such rate, fare or charge shall be reduced, and no such classification, regulation, or practice shall be changed in such manner as to reduce any such rate, fare, or charge, unless such reduction or change is approved by the Commission.''

Since counsel for the public service commission invokes the Tenth Amendment to the Constitution of the United States to the effect that '' the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people,'' as the fundamental basis of their argument, it is well to review at the outset the limitations upon the power of congress before attempting to construe the above provision of the Transportation Act of 1920.

The power of congress to legislate in relation to intrastate rates, in the absence of exercise of its war power or its power to regulate the mails, is found in its implied power to make effective the regulation of interstate commerce which has expressly been intrusted to its care.

Congress has exclusive power to regulate interstate commerce and state regulations conflicting with the exercise of this exclusive power are subordinated thereto. This has been definitely decided and settled. *Wabash, St. L. & P. R. Co.* v. *Illinois,* 118 U. S. 557; *Louisville & N. R. R. Co.* v. *Eubank,* 184 id. 27.

The United States Supreme Court has, however, differentiated between direct and indirect interference with and burdens upon interstate commerce by purely intrastate regulations. Where direct burdens have been cast upon interstate commerce, they have been enjoined in numerous instances, but with the possible exception of *Houston, East & West Texas R. Co.* v. *United States,* 234 U. S. 342, the question

of indirect burdens has been left undetermined beyond the suggestion that it is for congress to determine, within the limits of its constitutional authority over interstate commerce and its instruments, the measure of the regulation to be supplied to intrastate rates in order to prevent such interference with and burden upon interstate commerce. *Smyth* v. *Ames,* 169 U. S. 466; *Atlantic Coast Line* v. *Wharton,* 207 id. 328; *Minnesota Rate Cases,* 230 id. 352.

In the *Minnesota Rate Cases,* at page 432, the court said: " But these considerations are for the practical judgment of Congress in determining the extent of the regulation necessary under existing conditions of transportation to conserve and promote the interest of interstate commerce. If the situation has become such, by reason of the interblending of the interstate and intrastate operations of interstate carriers, that adequate regulation of their interstate rates cannot be maintained without imposing requirements with respect to their intrastate rates which substantially affect the former, it is for Congress to determine, within the limits of its constitutional authority over interstate commerce and its instruments the measure of the regulation it should supply."

Again, in the *Minnesota Rate Cases,* the court gave expression to the following, at page 399: " The authority of Congress extends to every part of interstate commerce, and to every instrumentality or agency by which it is carried on; and the full control by Congress of the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations. This is not to say that the Nation may deal with the internal concerns of the State, as such, but that the execution by Congress of its constitutional power to regulate inter-

Supreme Court, July, 1920. [Vol. 112.

state commerce is not limited by the fact that intrastate transactions may have become so interwoven therewith that the effective government of the former incidentally controls the latter. This conclusion necessarily results from the supremacy of the national power within its appointed sphere.''

In its Act to Regulate Commerce, congress made provision years ago for partial regulations of intrastate rates. The interstate commerce commission, in 1906, was given authority to order the removal of rates which were unduly preferential or prejudicial to persons, localities or descriptions of traffic.

In *Houston, East & West Texas R. Co.* v. *United States,* 234 U. S. 342, an order of the interstate commerce commission requiring the removal of such a preference was upheld by the Supreme Court. The effect was to increase state rates without the consent of the state. The basis of the finding of undue preference was that the state rates were lower than the interstate rates, which were found not to be unreasonably high, causing a discrimination against interstate commerce.

In the *Shreveport Rate Cases* the Supreme Court said at page 351: '' Wherever the interstate and intrastate transactions of carriers are so related that the government of one involves the control of the other, it is Congress, and not the State, that is entitled to prescribe the final and dominant rule, for otherwise Congress would be denied the exercise of its constitutional authority and the State, and not the Nation, would be supreme within the national field.''

Of course congressional enactment cannot arbitrarily invade the province of the state. To determine what is a direct or indirect burden on interstate commerce is not a matter of arbitrary decision, but there must be a reasonable judgment having its basis in a

proper consideration of all relevant acts. It must be assumed, however, in view of the decision of the Supreme Court, that congress has large powers over intrastate rates.

Congress has unquestionably given careful consideration to the decisions of the Supreme Court in its drafting of the Transportation Act of 1920, and a consideration of the act in the light of these decisions is helpful in reaching a proper interpretation of the intention of congress, as well as the limits of its constitutional authority.

The provisions under the title " Termination of Federal Control " constitute new legislation entirely separate and apart from and not amendatory of the Interstate Commerce Act, and were clearly intended to promote a return to a peace time status. The rates now in force, both interstate and intrastate, were initiated by the federal government under its war power. No question as to the present legality of those rates is or can be raised, or as to the war power of the federal government to suspend the state maximum rate statutes such as the New York Central two-cent per mile statute. The Supreme Court has said that " the complete and undivided character of the war power of the Nation is not disputable." *Northern Pacific Ry. Co.* v. *North Dakota,* 250 U. S. 135; *Dakota Central Telephone Co.* v. *South Dakota,* Id. 163.

It seems, also, that the war power persists beyond the cessation of actual warfare, sufficient to terminate the war time status and to promote the return to the peace time status. Upon this subject the Supreme Court has said: " The (war) power is not limited to victories in the field and the dispersion of the insurgent forces. It carries with it inherently the power to guard against the immediate renewal of the conflict

and to remedy the evils which have arisen from its rise and progress." *Stewart* v. *Kahn,* 78 U. S. 493, 507; *Hamilton* v. *Kentucky Distilleries & Warehouse Co.,* 251 id. 146, 161; 40 Sup. Ct. Repr. 106.

Considering the tremendous basic importance of the transportation problem to this country in the handling of reconstruction to a peace basis, the needs of larger revenue as recently recognized by the interstate commerce commission, to permit the railroads to remedy evils which have arisen from the rise and progress of the war, it may not be doubted that congress had power beyond its interstate commerce power to provide the remedy by enacting essentially a war time measure to promote a successful return to a peace status.

This congress has done, in a measure, at least, in the provisions of section 208(a) of the Transportation Act of 1920, under the title " Termination of Federal Control." This is the section especially requiring my interpretation here.

So far as this section requires all changes in rates prior to September 1, 1920, to be approved by the interstate commerce commission, congress plainly acted under its war power.

It seems to me, moreover, that congress had authority under its war power to expressly provide what the defendant railroad is here contending for as a proper interpretation of the language used, namely, that the existing rates cannot be changed after September 1, 1920, except by affirmative action of the states, and that the maximum rate statutes of the states will not be automatically revived on September 1, 1920, but must be revived by new legislation. I find no difficulty in agreeing to the proposition that congress had the power to so provide, but it is more difficult to reach the conclusion that it has done so.

Pub. Serv. Comm. *v.* N. Y. Central R. R. Co.  **625**

Misc.]                    Supreme Court, July, 1920.

Congress provided that the increased rates in effect February 29, 1920, the last day of federal control, should continue in effect "until thereafter changed by State or Federal authority, respectively, or pursuant to authority of law." The inhibition is that the rates should continue "until thereafter changed." It has been suggested that the word "thereafter" requires the interpretation that there should be an affirmative act on the part of the state in order to change the existing rates; that the existing rates should continue until the revested authority of the state shall be asserted through legislative enactment or administrative order to declare them unlawful; that congress intended to restore state power to regulate intrastate rates but sought to avoid the automatic operation of the numerous state maximum rate statutes and former state traffic schedules suspended by the war-time Federal Control Act.

That interpretation is clearly indicated, except possibly for the provision "pursuant to authority of law," which must be given effect.

Counsel for the public service commission has maintained that the state statute furnishes authority of law, that it has simply been suspended during the paramount exercise of authority of the nation under its war power, and that upon the relinquishment of the federal control, the state statute is automatically restored to its former authority, without re-enactment, citing the illustration of the automatic revival of authority of the state insolvency statutes upon the repeal of the United States Bankruptcy Act of 1867, as sanctioned by the Supreme Court. *Butler* v. *Goreley,* 146 U. S. 303, 314; *Tua* v. *Carriere,* 117 id. 201.

The difficulty with applying that decision of the Supreme Court lies in the fact that the Bankruptcy Act was a remedial statute and the act repealing it left

40

no obstacle to the availability of the remedies afforded by the state laws, whereas the federal control of railroads during the war has involved the interruption of regulatory proceedings and after a long period, during which changed conditions, not contemplated by the previous state statutes and administrative orders, have been created, the railroads are now handed back to the owning corporations with practical obstacles in the way of an immediate and promiscuous renewal of the former state regulations. The changed conditions are so obvious that they do not require demonstration. Public acts and orders in fact demonstrate it.

In handing the railroads back to their owners the government could find justification in preventing the automatic revival of the pre-existing maximum rate statutes and former orders of regulatory officers and in requiring a return to state regulation only after a reconsideration of such pre-existing statutes and orders in the light of such changed conditions. Congress had authority to do this, in my judgment, and I believe that was the intention of congress as expressed in section 208(a). If congress had not expressly provided that existing rates "shall continue in force and effect until thereafter changed," but had simply terminated federal control without saying anything about existing intrastate rates, the illustration of the revival of the state insolvency laws would be in point.

It remains only to consider the argument of the defendant railroad that the true interpretation of the language used by congress in section 208(a) is to require the revested authority of the state to be asserted through new legislation or new administrative orders of the public service commission to fix any different intrastate rates.

The clause " pursuant to authority of law " is inter-

preted by the defendant as referring to changes thereafter made pursuant to tariffs filed by the different corporations under the authority of law permitting, or even requiring, such filing. The language used is susceptible of that interpretation and may have been used to make clear the right of the railroads to initiate changes to higher rates as well as authorizing the public authorities to initiate changes.

If it were not for the context, the clause " pursuant to authority of law " could be given the meaning attributed to it by the public service commission, but the language preceding it convinces me that congress did not intend to bring the pre-existing state statute into operation by the use of the clause in question. The two-cent rate law applicable to the New York Central railroad has no authority as law now and if we give the words " shall continue in force and effect until thereafter changed " their plain and obvious meaning, giving effect to the words " continue " and " thereafter changed," we find that it was intended that existing rates should continue beyond March 1, 1920, the day set for the termination of federal control; that no other date is fixed by the act later than March 1, 1920, for the commencement of the operation of any pre-existing state rate statute; that September 1, 1920, cannot be adopted as such limiting date in view of the absence of any positive expression to that effect; that the fair interpretation of the final clause of section 208(a) referring to rates up to September 1, 1920, is that it was not intended to aid in the interpretation of the preceding language of the subdivision but was inserted in connection with other sections of the act, for the protection of the government, running for the same period, such as the sections forbidding the reduction of war-time wages for a period of six months and continuing the government

guaranty of war-time rental to railroads for the six months.

If there is no day set in the act for the discontinuance of the existing rates, how can it be said that the state two-cent rate statute has been or will be restored to authority on any particular day; and if it is not thus definitely restored to authority by the discontinuance of existing rates, how can it be said that the existing rates will have been " thereafter changed? " A change can come only by the revival of the state statute, or the passage of a new one. Congress has not expressly or impliedly revived it due to its failure to set a date for the discontinuance of existing rates. The public service commission cannot revive it. Its sole statutory authority for this proceeding is based upon the assumption that the state statute will be revived on September 1, 1920. The only body having authority to revive the statute on September 1, 1920, is the legislature, which has not acted.

This interpretation is borne out by the heading of section 208. That heading is, " Existing rates to continue in effect," and then in the body of the section follows the provision that they shall " continue " in effect until " thereafter changed."

It is perhaps unnecessary to consider any other provisions of the Transportation Act of 1920, but a review of a few of them tends to reveal the attitude of mind of congress toward the railroad situation necessarily created by the federal government under its war-time control. Increased national authority, largely in conformity with Supreme Court decisions, has clearly been asserted. Provision has been made for the adjustment of wage scales and the establishment of rates adequate to permit the railroads to earn reasonable profits upon the value of the property devoted to transportation use. Provision has also

been made granting added powers to the interstate commerce commission permitting carriers in addition to persons and localities to complain of discriminations between interstate and intrastate rates, specifically including discrimination against interstate commerce as such and authorizing the interstate commerce commission to prescribe intrastate rates in connection with the removal of any undue, unreasonable or unjust discrimination against interstate commerce found to exist, after full hearing.

It is true that in the amendments to the act to regulate commerce, section 400, subdivision 2, the Transportation Act of 1920 provides: '' The provisions of this Act * * * shall not apply — (a) To the transportation of passengers * * * wholly within one state.'' The act recognizes the primary right of the state to regulate intrastate rates but it asserts for the nation the right, in any proper case, to exert such control over intrastate rates as is necessary to make its regulation of interstate commerce effective and adequate.

The policy of the government, as reflected in this act, seems to be to continue existing rates until the state or nation changes them; to permit the state to change existing intrastate rates by affirmative action thereafter taken; and if the changes made result in undue discrimination against interstate commerce, the interstate commerce commission may remove such discrimination and prescribe the rate thereafter to be charged in such manner as to remove such discrimination, and to further show its increased nationalistic conception of its power and duty in the present transportation situation, congress has authorized the interstate commerce commission to fix such rates as will permit the railroads to earn a fair return upon the value of railroad property devoted to transportation:

It is thus clear that congress has recognized the changed conditions and has not contemplated in any way the return to the old peace-time conditions as to regulations which would be confusing and destructive and place an unnecessary and tremendous burden upon the interstate commerce commission. It has, therefore, revived the state authority, but has required a return to state regulations of intrastate rates only after a reconsideration by the states of their preexisting statutes and orders, in the light of the changed conditions.

I have considered the opinion of the learned United States judges recently handed down in the action of *New York Central Railroad* v. *Public Service Commission,* but for the reasons herein stated, I am unable to reach the conclusion of the majority of that court.

Having reached this interpretation and having found that the two-cent rate statute in question, namely, section 57 of the Railroad Law, will not be revived automatically on September 1, 1920, the prayer of the petition herein should be denied and the proceedings should be dismissed.

Ordered accordingly.