# NORTHERN PACIFIC RAILWAY COMPANY ET AL. *v.* STATE OF NORTH DAKOTA ON THE RELATION OF LANGER, ATTORNEY GENERAL.

## ERROR TO THE SUPREME COURT OF THE STATE OF NORTH DAKOTA.

No. 976. Argued May 5, 1919.—Decided June 2, 1919.

Under the "Federal Control Act" of March 21, 1918, c. 25, 40 Stat. 451, railroads taken over and administered under the war power pursuant to the Act of August 29, 1916, c. 418, 39 Stat. 645, and the President's Proclamation of December 26, 1917, are in the full possession and control of the Federal Government, and that Government is granted the power through the President and the Interstate Commerce Commission to fix the rates on intrastate traffic, superseding the state power over that subject. P. 148.

The Federal Control Act being an exercise of a complete, exclusive and necessarily paramount federal power (the war power) and its provision for a complete change to federal control being clear and unambiguous, there can be no room for a presumption that state control over intrastate rates was to remain unchanged because it previously existed. P. 149. *Reagan* v. *Mercantile Trust Co.,* 154 U. S. 413, distinguished.

Under § 10 of the Federal Control Act, the power of the Interstate Commerce Commission to consider rates, like the power of the President to initiate them, relates to both classes—intrastate and interstate. P. 151.

The declaration of § 15 that nothi g in the act shall be construed to amend, repeal, impair, or affect the existing laws or powers of the States in relation to taxation or "the lawful police regulations of the several States," except wherein such laws, powers, or regulations may affect the transportatic n of troops, etc., or "the issue of stocks and bonds," cannot be interpreted as withholding the power to initiate intrastate rates under § 10. *Id.*

Where the acts of a federal official are sought to be restrained in a state court, as invasions of state power, there is jurisdiction, if the claim be not frivolous, to pass upon their legality, although, if

legal, their restraint would affect directly the interests of the United States; which cannot be impleaded; and where the decision is against their legality, this court, finding it erroneous, has jurisdiction to reverse the resulting judgment upon the merits. P. 152.

.72 N. W. Rep. 324, reversed.

THE case is stated in the opinion.

*Mr. John Barton Payne* and *Mr. Charles Donnelly*, with whom *The Solicitor General* and *Mr. R. V. Fletcher* were on the brief, for the Director General of Railroads, maintained that the war power, limited only by the needs of the Government and independent of state lines, supported the action taken; that the act in letter and spirit shows a purpose to bring about a unified federal control, utterly inconsistent with the retention of state power over intrastate rates; and that the proviso saving "lawful police regulations" (§ 15) must be read accordingly, and subject to the particular provisions of § 10 expressly allowing the President to initiate rates, etc. The words "police regulations" are used here in contrast with "laws and powers" as applied to taxation; they include regulations for safety, health, etc. The railroads became federal agencies, not subject to state police power.

*Mr. Charles W. Bunn* filed a brief on behalf of the Northern Pacific Railway Co.

*Mr. Frank E. Packard*, with whom *Mr. William Langer*, Attorney General of the State of North Dakota, and *Mr. W. V. Tanner* were on the brief, for defendant in error:

Railroads built under acts of Congress and aided by government lands and bonds for the purpose of securing the use and benefit of such railroads for postal and military

purposes are subject to the state power to tax, *Thomson v. Union Pacific Ry. Co.,* 9 Wall. 579; *Union Pacific Ry. Co.* v. *Peniston,* 18 Wall. 5; and of eminent domain and of regulation. *Union Pacific Ry. Co.* v. *Burlington & Missouri River Ry. Co.,* 3 Fed. Rep. 106, and *Union Pacific Ry. Co.* v. *Leavenworth N. & S. Ry. Co.,* 29 Fed. Rep. 728.

The power to regulate and the power to tax are inherent in sovereignty—the power to tax being the more drastic of the two. Therefore, as the power to tax may be exercised in respect to the agency or instrumentality of the Federal Government, the power to regulate can likewise be exercised by the State. This was the rule laid down in *Reagan* v. *Mercantile Trust Co.,* 154 U. S. 413, where it was held that, in the absence of an express exemption from state control, it must be assumed that Congress intended the corporation to be subject to the ordinary control exercised by the State. In *Smyth* v. *Ames,* 169 U. S. 466, a statute involving railroad rates was held constitutional as applied to the Union Pacific Railroad, a government agent and instrumentality.

We think it a fair inference from the decided cases, to assume that the rail control acts involve no question of conflict between state and federal powers. The question here is not merely one of the existence of inherent power either in the National Government or in the States, but the purpose manifested by Congress to exert its powers to the exclusion of that of the States. The question of the extent to which the laws of the State have been superseded by the acts of Congress must be determined from the nature of the provisions of each and the extent to which they are in conflict. This court has repeatedly announced the rule that the question of conflict is to be determined by the ordinary rules of statutory construction and that it should not be held that the state legislation has been superseded except in cases of manifest

repugnancy.   *Reid* v. *Colorado*, 187 U. S. 137, 148; *Missouri &c. Ry. Co.* v. *Haber*, 169 U. S. 613, 623.

Congress in § 10 of the Act of 1918 expressly states its intent that the carriers shall be subject to the provisions of existing law, except (1) where such laws are inconsistent with the provisions of the act or any other act applicable to federal control, and (2) except where such law are inconsistent with any order of the President.   Thus we find the rule written into the statute itself.

The power vested in the President to initiate rates is not inconsistent with the laws of the State relating to the filing and establishment of rates.   The use of the word "initiate" in defining the power of a public agency is new, but manifestly it is used in the sense of proposing a rate rather than in the sense of fixing or establishing the rate. Under federal laws and in most of the States, carriers have had the power to initiate rates.   This, however, has never been regarded as inconsistent with the fixing and establishment of rates by commissions nor with the obligation to comply with provisions of law respecting the filing and publication of the rates so initiated.   Nor is an inconsistency created by the provision for the filing of the rates initiated by the President with the Interstate Commerce Commission.   Prior to federal control rates initiated by the carriers were required to be filed with the state commissions and the Interstate Commerce Commission, and, as pointed out, since the initiation of the rate is not the fixing of that rate, there is no inconsistency in permitting a rate to be initiated by filing it with the Interstate Commerce Commission and the concurrent requirement of compliance with state laws upon the subject.

The absence of an express provision in § 10 saving the power of the States to act through the state commissions in cases involving intrastate rates is explained by the provision of § 15 saving the police power of the States.   Having preserved to the States their right to make police

regulations (with certain exceptions), it was wholly un-. necessary to expressly save the jurisdiction of the state authorities as was done in the case of the Interstate Commerce Commission.

The provision in § 10 would support a theory that Congress had in mind the idea of the use of the railroads as a vehicle of taxation for the support of the war, and that, regarded as such an instrument, the power of the President in the initiation of rates was unlimited. In view, however, of the provision of the section making "justness and reasonableness" the basis of the Commission's action, we do not believe the taxation theory can be maintained. Certainly those provisions of the Federal Control Act with relation to the exercise by the Interstate Commerce Commission of the powers now possessed by that body, although modified by the existence of federal control, cannot be held to be inconsistent to the point of conflict with the existence of state laws regulating the publication and fixing of "reasonable rates for its exclusively internal traffic." *Minnesota Rate Cases,* 230 U. S. 352. The provisions of the Federal Control Act, in so far as they affect the Interstate Commerce Commission, are purely restrictions or limitations upon the power of that tribunal. These provisions evidence no intent upon the part of Congress to broaden the powers of the Commission or to extend its authority over intrastate rates. It may be contended that by reason of the provision for the taking over of all the revenues of the carriers under federal control Congress intended to assume authority to fix all rates, interstate and intrastate. It should be remembered that a carrier is entitled to receive reasonable rates and that this right cannot be denied by a State, either through a commission or otherwise.

The question is as to the power in the matter of purely intrastate rates. The Government claims that the war emergency justified the exercise of the supreme power of

the Federal Government. Assume that it did. This is no reason why the law should not have said so.

The intent of Congress not to interfere with the right of the States to establish reasonable intrastate rates is evidenced by § 15 of the act.

As early as *Chicago & Northwestern R. R. Co.* v. *Fuller*, 17 Wall. 560, it was held that railroad regulatory legislation was an exercise of the police power. See also *Munn* v. *Illinois*, 94 U. S. 113; *Union Dry Goods Co.* v. *Georgia Public Service Corporation*, 248 U. S. 372, 374, 375.

It would seem unnecessary to examine the multitudinous definitions of the expressions "police powers" or "police regulations." We think the intent of Congress is apparent from the language of the proviso itself. The fact that Congress deemed it necessary to except police regulations affecting "the issue of stocks and bonds" shows that Congress deemed such laws to be police regulations. This is not consistent with the use of the term in its narrower sense. Evidently Congress had in mind the so-called Blue Sky Laws in force in various States, and felt it necessary that the carriers and the Government should be exempt from such laws during the emergency. Such a law was before this court in *Union Pacific R. R. Co.* v. *Public Service Commission*, 248 U. S. 67. Laws of this character, however, are not included within the narrower definitions of police powers or police regulations.

It is true that in its narrower sense police power is sometimes regarded as including measures for the protection of the public morals, and that one of the purposes of Blue Sky legislation is to prevent fraud. The paramount purpose of such laws, however, is to insure business prosperity and promote the economic welfare of the State.

State regulation of local rates does not "affect the transportation of troops, war materials (or) Government supplies."

The President has not been vested with authority to set

aside state laws, whenever he thinks it necessary to do so, for purposes connected with the war or for purposes connected only with the ordinary administration of railroad affairs. The act subordinates state laws to such orders as the President is validly authorized to make by the Act of March 21, 1918, and the Act of August 29, 1916. Any order not so authorized would be of no effect. This is the interpretation stated on the floors of Congress by the member in charge of the bill. 56 Cong. Rec., p. 3497.

The legislative history of the Federal Control Act shows that under the intention of Congress the States were to retain their power to regulate local rates. S. 3752; H. R. 9685; 56 Cong. Rec., pp. 1685, 1857, 1939, 1940, 1944, 2337, 2519, 2835.

When a proposed act as introduced in the legislature establishes one rule (*e. g.,* broadly empowers the President to fix rates), and during its progress through that body is changed so that, giving the words used their ordinary definite meaning, the act means something else (*e. g.,* intrastate rates to be fixed by local authorities), that fact is of the greatest importance in determining the intention of the legislature.

*Mr. Charles E. Elmquist,* by leave of court, filed a brief as *amicus curiæ* on behalf of thirty-seven States and the National Association of Railway and Utilities Commissioners.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

In taking over the railroads from private ownership to its control and operation, was the resulting power of the United States to fix the rates to be charged for the transportation services to be by it rendered subordinated to the asserted authority of the several States to regulate the

rates for all local or intrastate business, is the issue raised on this record. It arises from the allowance by the court below of a peremptory writ of mandamus commanding the Director General of the Railroads, appointed by the President, and the officers of the Northern Pacific Railway Company to desist from charging for transportation in intrastate business in North Dakota the rates fixed by the United States for such services. When this command was obeyed, the mandamus ordered that the Director General should thereafter exact for the services stated only lesser rates which were fixed in a schedule on file with the State Utilities Commission prior to the bringing of suit and which rates under the law of North Dakota could not be changed without the approval of the Utilities Commission. In the opinion of the court below it was stated that all the parties admitted that there was no question as to the jurisdiction to consider the controversy and that they all also agreed that no contention was presented as to the power of Congress to enact the law upon which the controversy depended, as the correct interpretation of such law was the only issue to be decided. We consequently put those subjects temporarily out of view. We say temporarily, since, even upon the assumption that issues concerning them necessarily inhere in the cause and cannot be waived by the parties, we could not decide concerning such issues without interpreting the statute, which we proceed to do.

. On the 29th of August, 1916 (39 Stat. 645), Congress gave the President power "in time of war . . . to take possession and assume control of any system or systems of transportation, or any part thereof, and to utilize the same, to the exclusion as far as may be necessary of all other traffic thereon, for the transfer or transportation of troops, war material and equipment, or for such other purposes connected with the emergency as may be needful · or desirable." War with Germany was declared in April, 1917, and with Austria on December 7th of the same year

(40 Stat. 1; *ib.* 429). On December 26, 1917, the President, referring to the existing state of war and the power with which he had been invested by Congress in August, 1916, proclaimed that:

"Under and by virtue of the powers vested in me by the foregoing resolutions and statute, and by virtue of all other powers thereto me enabling, [I] do hereby . . . take possession and assume control at 12 o'clock noon on the twenty-eighth day of December, 1917, of each and every system of transportation and the appurtenances thereof located wholly or in part within the boundaries of the continental United States and consisting of railroads, and owned or controlled systems of coastwise and inland transportation, engaged in general transportation, whether operated by steam or by electric power, including also terminals, terminal companies and terminal associations, sleeping and parlor cars, private cars and private car lines, elevators, warehouses, telegraph and telephone lines and all other equipment and appurtenances commonly used upon or operated as a part of such rail or combined rail and water systems of transportation;—to the end that said systems of transportation be utilized for the transfer and transportation of troops, war material and equipment, to the exclusion so far as may be necessary of all other traffic thereon; and that so far as such exclusive use be not necessary or desirable, such systems of transportation be operated and utilized in the performance of such other services as the national interest may require and of the usual and ordinary business and duties of common carriers." [40 Stat. 1733.]

By the proclamation a Director General of Railroads was appointed with full authority to take possession and control of the systems embraced by the proclamation and to operate and administer the same. To this end the Director General was given authority to avail himself of the services of the existing railroad officials, boards of

directors, receivers, employees, etc., who were authorized to continue to perform their duties in accordance with their previous authority "until and except so far as said Director shall from time to time by general or special orders otherwise provide." Limited by the same qualification the systems of transportation taken over by the Government were made subject to existing statutes and orders of the Interstate Commerce Commission and to all statutes and orders of regulating commissions of the various States in which said systems or any part thereof might be located. In addition, however, to the limitation previously stated the proclamation in express terms declared: "But any orders, general or special, hereafter made by said Director, shall have paramount authority and be obeyed as such."

The proclamation imposed the duty upon the Director General to negotiate with the owners of the railroad companies for an agreement as to compensation for the possession, use and control of their respective properties on the basis of an annual guaranteed compensation and with reservations in the interest of creditors, bondholders, etc. The proclamation in concluding declared that "from and after twelve o'clock on said twenty-eighth day of December, 1917, all transportation systems included in this order and proclamation shall conclusively be deemed within the possession and control of said Director without further act or notice." Carrying out the authority exerted by the proclamation, the railroads passed into the possession, control and operation of the Director General.

On March 21, 1918, dealing with the subject, Congress passed a law entitled "An Act To provide for the operation of transportation systems while under Federal control, for the just compensation of their owners, and for other purposes." [C. 25, 40 Stat. 451.] The opening sentences of the act declared: "That the President, having in time of war taken over the possession, use, control, and operation

(called herein Federal control) of certain railroads and
systems of transportation (called herein carriers), is hereby
authorized to agree with and to guarantee to any such
carrier making operating returns to the Interstate Com-
merce Commission, that during the period of such Federal
control it shall receive as just compensation an annual sum,
payable from time to time in reasonable installments, for
each year and pro rata for any fractional year of such
Federal control, not exceeding a sum equivalent as nearly
as may be to its average annual railway operating income
for the three years ended " June 30, 1917.

Without going into detail it suffices to say that the
first eight sections of the act comprehensively provided
for giving effect to the purposes just stated and in a gen-
eral way contemplated affording what was deemed to be
just compensation to the owners for the use of their prop-
erty. In addition it empowered agreements in the inter-
est of security holders of the railroads and sanctioned
provisions deemed fair to the United States and to the
owners of the property for betterments which might be
required to be made during the term of control and for the
return of the property when the government possession
came to an end, which return was to be accomplished
within a stated period after the cessation of war by the
proclamation of the ratification of a peace treaty.

Beyond doubt also, for the purpose of enabling the
United States to perform the obligations which it assumed
and to secure it from ultimate loss from the pecuniary
responsibilities which might result, including the repay-
ment to it of an appropriation of $500,000,000 which the
act made applicable, all the earnings of the railroads were
by the act expressly made the property of the United
States.

The remaining eight sections of the act need not be
stated; but as § 10, which expressly provides for the power
to fix rates, and § 15, making certain reservations concern-

ing the powers granted, were greatly relied upon in the opinion below and in the argument at bar, we reproduce in the margin the more relevant portions of § 10 and the text of § 15.[1]

---

[1] "Section 10. . . . That during the period of Federal control, whenever in his opinion the public interest requires, the President may initiate rates, fares, charges, classifications, regulations, and practices by filing the same with the Interstate Commerce Commission, which said rates, fares, charges, classifications, regulations, and practices shall not be suspended by the commission pending final determination.

"Said rates, fares, charges, classifications, regulations, and practices shall be reasonable and just and shall take effect at such time and upon such notice as he may direct, but the Interstate Commerce Commission shall, upon complaint, enter upon a hearing concerning the justness and reasonableness of so much of any order of the President as establishes or changes any rate, fare, charge, classification, regulation, or practice of any carrier under Federal control, and may consider all the facts and circumstances existing at the time of the making of the same. In determining any question concerning any such rates, fares, charges, classifications, regulations, or practices or changes therein, the Interstate Commerce Commission shall give due consideration to the fact that the transportation systems are being operated under a unified and coördinated national control and not in competition.

"After full hearing the commission may make such findings and orders as are authorized by the Act to regulate commerce as amended, and said findings and orders shall be enforced as provided in said Act: *Provided, however*, That when the President shall find and certify to the Interstate Commerce Commission that in order to defray the expenses of Federal control and operation fairly chargeable to railway operating expenses, and also to pay railway tax accruals other than war taxes, net rents for joint facilities and equipment, and compensation to the carriers, operating as a unit, it is necessary to increase the railway operating revenues, the Interstate Commerce Commission in determining the justness and reasonableness of any rate, fare, charge, classification, regulation, or practice shall take into consideration said finding and certificate by the President, together with such recommendations as he may make."

"Sec. 15. That nothing in this Act shall be construed to amend, repeal, impair, or affect the existing laws or powers of the States in relation to taxation or the lawful police regulations of the several States.

On May 25, 1918, the Director General made an order establishing a schedule of rates for all roads under his control and covering all classes of service, intrastate as well as interstate. The order made these rates effective on designated dates in the month of June and they were continuously enforced during a period of about eight months up to the 14th of February, 1919, when the bill in this case was filed by the State Utilities Commission for mandamus against the Director General and the officers of the Northern Pacific Railway, asserting the want of power in the United States over intrastate rates and the exclusive right of the State of North Dakota to fix such rates for all intrastate business done in that State. The Director General, admitting that he had made the order complained of and had collected the rates earned thereunder and paid them into the Treasury of the United States, sustained his action and denied the alleged right of the State upon the legislation and official acts which we have stated. The Northern Pacific denied interest on the ground that its railway had passed under federal control and that it was receiving the compensation therefor which had been agreed on between itself and the United States. It alleged that the rates under the order complained of had been collected by the Director General through agents appointed by him who were not officials of the company and therefore it had no responsibility concerning them. The prayer was that it be dismissed from the suit.

Taking the case under the complaint, the returns and the exhibits, the court, as we have previously stated, two of its members dissenting, denied the authority of the United States and upheld that of the State, and the mandamus was made peremptory as to both the Director

except wherein such laws, powers, or regulations may affect the transportation of troops, war materials, Government supplies, or the issue of stocks and bonds."

General and the officers of the Northern Pacific Railway. We are thus brought to the question whether the state authority controls the power of the United States as to intrastate rates.

No elaboration could make clearer than do the Act of Congress of 1916, the proclamation of the President exerting the powers given, and the Act of 1918 dealing with the situation created by the exercise of such authority, that no divided but a complete possession and control were given the United States for all purposes as to the railroads in question. But if it be conceded that despite the absolute clarity of the provisions concerning the control given the United States, and the all-embracing scope of that control, there is room for some doubt, the consideration of the general context completely dispels hesitancy. How can any other conclusion be reached if consideration be given the comprehensive provisions concerning the administration by the United States of the property which it was authorized to take, the financial obligations under which it came and all the other duties and exactions which the act imposed, contemplating one control, one administration, one power for the accomplishment of the one purpose, the complete possesssion by governmental authority to replace for the period provided the private ownership theretofore existing? This being true, it must follow that there is no basis for the contention that the power to make rates and enforce them which was plainly essential to the authority given was not included in it.

Conclusive as are these inferences, they are superfluous, since the portion of § 10 as previously reproduced in the margin in express terms confers the complete and undivided power to fix rates. The provision is this: "That during the period of Federal control, whenever in his opinion the public interest requires, the President may initiate rates, fares, charges, classifications, regulations, and prac-

tices by filing the same with the Interstate Commerce Commission, which said rates, fares, charges, classifications, regulations, and practices shall not be suspended by the commission pending final determination." These quoted words are immediately followed by provisions further defining the power of the Commission and its duty in the premises, so as to enable it beyond doubt to consider the situation resulting from the act and to which the rates were to be applied. The unison between that which is inferable and that which is expressed demonstrates the true significance of the statute.

A brief consideration of the contentions relied upon to the contrary will at once show either their inappositeness, the mistaken premises upon which they rest, or the errors of deduction upon which they proceed. It is argued that as state control over intrastate rates was the rule prior to the enactment of the statute creating United States control, the statute must be interpreted in the light of a presumption that a change as to state control was not made. But in view of the unambiguous provision of the statute as to the new character of control which it created, the principle of interpretation applied in its ultimate aspect virtually was: that because the statute made a fundamental change, it must be so interpreted as to prevent that change from becoming effective.

Besides, the presumption in question but denied the power exerted in the adoption of the statute, and displaced by an imaginary the dominant presumption which arose by operation of the Constitution as an inevitable effect of the adoption of the statute, as shown by the following:

(a) The complete and undivided character of the war power of the United States is not disputable. *Selective Draft Law Cases*, 245 U. S. 366; *Ex parte Milligan*, 4 Wall. 2; *Legal Tender Cases*, 12 Wall. 457; *Stewart* v. *Kahn*, 11 Wall. 493. On the face of the statutes it is manifest that

they were in terms based upon the war power, since the authority they gave arose only because of the existence of war, and the right to exert such authority was to cease upon the war's termination. To interpret, therefore, the exercise of the power by a presumption of the continuance of a state power limiting and controlling the national authority was but to deny its existence. It was akin to the contention that the supreme right to raise armies and use them in case of war did not extend to directing where and when they should be used. *Cox* v. *Wood*, 247 U. S. 3.

(b) The elementary principle that under the Constitution the authority of the Government of the United States is paramount when exerted as to subjects concerning which it has the power to control, is indisputable. This being true, it results that although authority to regulate within a given sphere may exist in both the United States and in the States, when the former calls into play constitutional authority within such general sphere the necessary effect of doing so is, that to the extent that any conflict arises the state power is limited, since in case of conflict that which is paramount necessarily controls that which is subordinate.

Again, as the power which was exerted was supreme, to interpret it upon the basis that its exercise must be presumed to be limited was to deny the power itself. Thus, once more it comes to pass that the application of the assumed presumption was in effect but a form of expression by which the power which Congress had exerted was denied. In fact, error arising from indulging in such erroneous presumption permeates every contention. To illustrate: Because in *Reagan* v. *Mercantile Trust Co.*, 154 U. S. 413, and other cases unnecessary to be referred to, it was held that it would be presumed that Congress in creating a corporation intended that it should be subject to applicable state laws and regulations so far as Congress did not otherwise provide, therefore, because Congress had

taken over to the Government of the United States property to be used by it in the performance of a governmental function, Congress must be presumed to have intended that such property (and such function) should continue to be subject to and controlled by state power.

The confusion produced is again aptly illustrated by the rule of interpretation by which it is insisted that the express power to fix rates conferred by the statute was rightly disregarded. Thus, while admitting that the power which was conferred to initiate rates when considered in and of itself included all rates, it is nevertheless said that such power must be presumed to be limited to the only character of rates which under the prior law the Interstate Commerce Commission had the power to consider, that is, interstate rates, because the new rates when initiated were to be acted upon by that body. As, however, the statute in terms gives power to the Interstate Commerce Commission to consider the new rates in the light of the new and unified control which it creates, the error in the contention becomes manifest, even putting out of view the fact that by the effect of the duty imposed and the new control created the new rates applying to the new conditions were within the purview of the power which the Interstate Commerce Commission previously possessed. Certainly, to mistakenly disregard one provision of the statute intended to give effect to another and upon that basis to decide that the statute is not enforceable, cannot be said to be a correct interpretation. And this view is also true as to the application which was made of the asserted presumption to the excepting clauses of § 15, previously reproduced in the margin, since that section in the light of the purpose to retain the prior law is interpreted so as to cause it to be but an additional means of destroying the all-embracing power to inititate rates fixed by § 10.

It follows that the judgment below was erroneous. The

relief afforded against the officer of the United States proceeded upon the basis that he was exerting a power not conferred by the statute, to the detriment of the rights and duties of the state authority, and was subject therefore to be restrained by state power within the limits of the statute. Upon the premise upon which it rests, that is, the unlawful acts of the officers, the proposition is undoubted, but in view of our conclusion that the acts of the officers complained of were authorized by the law of the United States, the question arises how far, that being established, it results that the suit was one against the United States over which there was no jurisdiction within the rulings in *Belknap* v. *Schild,* 161 U. S. 10; *International Postal Supply Co.* v. *Bruce,* 194 U. S. 601; *Louisiana* v. *McAdoo,* 234 U. S. 627; *Minnesota* v. *Hitchcock,* 185 U. S. 373; *Wells* v. *Roper,* 246 U. S. 335.

The principle of these cases, however, can only be applicable by giving effect to the conclusion we have reached as to the legality of the acts of the officers which were complained of, and to decide which question the United States was not a necessary party. This is undoubtedly true unless it can be said that the contentions concerning the want of power in the officers were so unsubstantial and frivolous as to afford no basis for jurisdiction and hence caused the suit to be from the beginning directly against the United States. As, however, we are of the opinion that there is no ground for that view, it follows that the case as made gave jurisdiction to dispose of the question of wrong committed by the officials, and that a decree giving effect to our conclusion on that subject will dispose of the entire case.

Our decree therefore must be and it is

*Reverse and remand for further proceedings not inconsistent with this opinion.*

MR. JUSTICE BRANDEIS concurs in the result.