BOSTWICK *v.* DIRECTOR GENERAL OF RAILROADS.

1. RAILROADS—FEDERAL OPERATION DID NOT CONSOLIDATE—SERV-
ANTS OF DIFFERENT SYSTEMS NOT FELLOW SERVANTS.

The taking over of the railroads by the Federal govern-
ment under authority of congress (39 U. S. Stat. chap.
418, pp. 619-645, and 40 U. S. Stat. p. 451) did not con-
solidate individual carriers as to their respective legal
rights and liabilities, and did not constitute the employees
of different railroad systems fellow servants of each other,
although said systems were operated by the director
general for the Federal government.

2. MASTER AND SERVANT—RAILROADS—NEGLIGENCE—FELLOW SERV-
ANTS—FEDERAL EMPLOYERS' LIABILITY ACT.

An employee of one railroad company injured by an en-
gine on the tracks of another railroad company while both
railroads were being operated by the director general of
railroads for the Federal government is not entitled to
recover under the Federal employers' liability act, since
the negligence, if any, of those operating the engine was
not that of fellow servants of plaintiff.

Error to Wayne; Codd (George P.), J.    Submitted
April 5, 1922.    (Docket No. 27.)    Decided October 2,
1922.

Case by Frank C. Bostwick against John B. Payne,
director general of railroads, for personal injuries.
Judgment for plaintiff.    Defendant brings error.    Re-
versed.

*Parker, Shields & Seaton,* for appellant.

*Frederic T. Harward* and *Earl I. Heenan,* for ap-
pellee.

SHARPE, J.    On March 9, 1918, plaintiff was work-

On Federal control of public utilities, see notes in 4 A. L. R.
1680; 8 A. L. R. 969; 10 A. L. R. 956; 11 A. L. R. 1450; 14 A.
L. R. 234.

ing as a brakeman on a train engaged in moving freight cars on the Wabash railroad in Detroit. The train was going west. About the time it reached Clark street the forward car became separated from the tender. The locomotive was equipped with a running board at each end. The plaintiff, who had been riding in the cab, stepped back and adjusted the coupling. There are three parallel tracks at this point. The Wabash train occupied the north track. Plaintiff stepped off the running board on the south side, took a few steps and was struck by a Pere Marquette locomotive going east.

Plaintiff's declaration contains two counts. In the first a right of recovery is claimed due to negligence on the part of the employees of both trains. In the second he alleges that he was injured while employed by the defendant in acts of interstate commerce; and claims the right to recover under the Federal employers' liability act. To recover under the first count, it must appear that his own negligence did not contribute to the injury he received. Under the second count, this would not bar recovery in case negligence on the part of the defendant was established. In that event, the damages sustained would be apportioned as provided for in the act.

At the conclusion of the proofs the plaintiff was compelled to elect between the two counts. He chose the second. Defendant's counsel then preferred the following request:

"I charge you that plaintiff may not recover in this case under the Federal employers' liability act for any act of negligence which occurred in the operation of the Pere Marquette railway."

The court charged that no recovery could be had "based on any negligence * * * in the operation of the Wabash railroad." He instructed the jury that

plaintiff might recover under the employers' liability act in case the negligence of the crew in charge of the Pere Marquette train caused or contributed to plaintiff's injury, and that in the event they found plaintiff's negligence also contributed thereto they should apportion the damage due to his injury. The jury found for the plaintiff in the sum of $9,500, and the defendant reviews the judgment entered by writ of error.

It is plaintiff's claim that, under the Federal provisions, the employees of the Wabash and the Pere Marquette railroads "were servants of a common master," hence the plaintiff was a fellow servant of the crew operating the Pere Marquette train.

At the time of plaintiff's injury both the Wabash and the Pere Marquette railroads were under governmental control. The president had taken possession pursuant to a proclamation issued on December 26, 1917, under the act of August 29, 1916, chap. 418, 39 U. S. Stat. pp. 619, 645 (U. S. Comp. Stat. § 1974*a*), The purpose as expressed in the statute was—

"to utilize the same, to the exclusion as far as may be necessary of all other traffic thereon, for the transfer and transportation of troops, war material and equipment, or for such other purposes connected with the emergency as may be needful or desirable."

Subsequently, congress enacted what is known as the "Federal control act" (40 U. S. Stat. p. 451), and operation proceeded thereunder. The 10th section of this act reads as follows:

"That carriers while under Federal control shall be subject to all laws and liabilities as common carriers, whether arising under State or Federal laws or at common law, except insofar as may be inconsistent with the provisions of this Act or any other Act applicable to such Federal control or with any order of the President. Actions at law or suits in equity may be brought by and against such carriers and judg-

ments rendered as now provided by law and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the Federal Government. Nor shall any such carrier be entitled to have transferred to a Federal Court any action heretofore or hereafter instituted by or against it, which action was not so transferable prior to the Federal control of such carrier; and any action which has heretofore been so transferred because of such Federal control or of any Act of Congress or official order or proclamation relating thereto shall upon motion of either party be retransferred to the court in which it was originally instituted. But no process, mesne or final, shall be levied against any property under such Federal control."

The proclamations of the president in assuming Federal control throw light upon the understanding of the executive as to the legislative intent. In that issued on December 26, 1917, under the act of 1916, it is said:

"Until and except so far as said director shall from time to time by general or special orders otherwise provide, the *boards of directors, receivers, officers and employees of the various transportation systems shall continue the operation thereof in the usual and ordinary course of the business of common carriers in the names of their respective companies.*

"Until and except so far as said director shall from time to time otherwise by general or special orders determine, such systems of transportation *shall remain subject to all existing statutes and orders of the interstate commerce commission, and to all statutes and orders of regulating commissions of the various States in which said systems or any part thereof may be situated.* But any orders, general or special, hereafter made by said director, shall have paramount authority and be obeyed as such." 40 U. S. Stat. p. 1734.

That issued on April 11, 1918, under the Federal control act contains similar language.

Confusion arose as to whether suit might not be maintained against the carrier company thus taken over for causes of action accruing thereafter. This resulted in the promulgation, on October 28, 1918, by the director general of order No. 50. It reads in part as follows:

"IT IS THEREFORE ORDERED, that actions at law, suits in equity, and proceedings in admiralty hereafter brought in any court based on contract, binding upon the director general of railroads, claim for death or injury to person or for loss and damage to property, arising since December 31, 1917, and growing out of the possession, use, control or operation of any railroad or system of transportation by the director general of railroads, which actions, suits, or proceedings but for Federal control, might have been brought against the carrier company shall be brought against William C. McAdoo, director general of railroads, and not otherwise."   *   *   *

While these and nearly all other railroads in this country were taken over under the act of congress and operated under a single directing head, we are impressed that there was no such consolidation as rendered them in effect one railroad company and the employees of the several roads so operated fellow servants of each other. The purpose of the action taken by congress as manifested by the language of the act has been stated. In *Northern Pac. R. Co.* v. *North Dakota,* 250 U. S. 135, 148 (39 Sup. Ct. 502, P. U. R. 1919D, 705), the purpose was said to be to enable the Federal government to exercise "one control, one administration, one power for the accomplishment of the one purpose, the complete possession by governmental authority to replace, for the period provided, the private ownership theretofore existing." To effect this purpose, it was apparent that there must be a directing head; that some person must be given authority to control the movement of

trains, the passenger or freight service they should render, and the use of all the equipment, to the end that the demands of the government should be first met. The operating officials, as a rule, were left in control; the employees, in most instances, were retained. The roads were all operated under the corporate names theretofore assumed by them. Their separate identity did not become merged. The several systems were recognized in all literature issued and blanks used. Each system was operated independently of every other. Further particulars as to the manner of operation will be found in the language hereafter quoted from *Missouri Pac. R. Co.* v. *Ault,* 256 U. S. 554 (41 Sup. Ct. 593).

The language of section 10 is significant. It provides that "carriers while under Federal control shall be subject to all laws and liabilities" not inconsistent with the control assumed. The individual roads are designated as "such carrier." Before general order No. 50 was promulgated, many of the courts held that under this section recovery might be had and enforced against the railroad company for torts committed while under Federal operation and that payment thereof was a matter of adjustment with the Federal authorities. Order No. 50 in no way enlarged the liability for such torts. It simply made definite the party against whom action might be brought. We can find no intent on the part of congress to create the relation of fellow servant between the employees of the several systems.

In the recent case of *Missouri Pac. R. Co.* v. *Ault,* *supra,* the relation of the Federal government to the railroads while under its control was considered. After quoting section 10 of the act, the court says:

"The plain purpose of the above provision was to preserve to the general public the rights and remedies against common carriers which it enjoyed at the time

the railroads were taken over by the president, except insofar as such rights or remedies might interfere with the needs of Federal operation. The provision applies equally to cases where suits against the carrier company were pending in the courts on December 28, 1917; to cases where the cause of action arose before that date and the suit against the company was filed after it; and to cases where both cause of action and suit had arisen or might arise during Federal operation. The government was to operate the carriers, but the usual immunity of the sovereign from legal liability was not to prevent the enforcement of liabilities ordinarily incident to the operation of carriers.

"The situation was analogous to that which would exist if there were a general receivership of each transportation system. Operation was to be continued as theretofore, with the old personnel, subject to change by executive order. * * * The president took over the physical properties, the transportation systems, and placed them under a single directing head; but he took them over as entities, and they were always dealt with as such (Bull. No. 4, p. 113). Each system was required to file its own tariffs. General Order No. 7, Bull. 4, p. 151. Each was required to take an inventory of its materials and supplies. General Order No. 10, *id.* p. 170. Each Federal treasurer was to deal with the finances of a single system; his bank account was to be designated "(Name of Railroad), Federal Account." General Order No. 37, *id.* p. 313. Each of 165 systems was named individually in the order promulgating the wage awards of the railroad wage commission. General Order No. 27, *id.* pp. 198, 200. And throughout the orders and circulars there are many such expressions as 'two or more railroads or boat lines under Federal control.' See General Order No. 11, *id.* p. 170. It is this conception of a transportation system as an entity which dominates section 10 of the act. The systems are regarded much as ships are regarded in admiralty. They are dealt with as active, responsible parties, answerable for their own wrongs. But since levy or execution upon their property was precluded as inconsistent with the government's needs, the liability of the transportation system was to be enforced by allowing suit

to be brought against whoever, as the party operating the same, was legally responsible under existing law, although it were the government."

In *Peacock* v. *Railway Co.*, 208 Mich. 403 (8 A. L. R. 964), this court had occasion to consider the several statutes and orders above referred to. In discussing the relation between the director general and the railroads under his control, it was said:

"The relations were either technically those of lessor and lessee or analogous thereto."

Other courts have suggested that "the situation was analogous to that which would exist if there were a general receivership of each transportation system." *Missouri Pac. R. Co.* v. *Ault, supra; Rutherford* v. *Railroad Co.*, 254 Fed. 880. It is apparent that the relationship of lessor and lessee or that of a receivership would not constitute the employees of the different systems fellow servants of each other. Workmen are fellow servants when employed by the same master, working under the same control, deriving authority and compensation from the same source and engaged in the same general business. 26 Cyc. p. 1282.

In the syllabus prepared by the court in the late case of *Payne* v. *Monroe* (Ga. App.), 110 S. E. 34, the third paragraph reads:

"Federal control held not to consolidate individual carriers as to their respective legal rights and liabilities; petition held not to allege that agent of director general was agent of delivering carrier.

"Federal control, under the act of congress (39 U. S. Stat. pp. 619, 645 [U. S. Comp. Stat. § 1974*a*]) and the proclamations and orders of the president of the United States and the director general of railroads, while effecting a consolidation of the physical control of the different transportation systems, did not effect a consolidation of the individual companies, so far as their respective legal rights and liabilities were concerned. *Missouri Pacific R. Co.* v. *Ault,*

256 U. S. 554 (41 Sup. Ct. 593) ; *Hines* v. *McCook*, 25 Ga. App. 395 (103 S. E. 690) ; 4 A. L. R. 1680, case notes; 10 A. L. R. 956, notes; 8 A. L. R. 969, notes; 13 A. L. R. 1023, notes.   Hence the allegation that the receiving and routing agent, making the misleading statements, was the agent of the director general, did not amount to an allegation that he was the agent of the delivering carrier that, as a warehouseman, made and collected the demurrage charge after the termination of the transportation."

The cases cited will be found instructive.

We feel constrained to hold that the plaintiff, while engaged in the operation of the Wabash train, was not a fellow servant of the crew operating the Pere Marquette train; that he had no right of recovery under the Federal employers' liability act and that defendant's request for a directed verdict should have been given.   Plaintiff's election to proceed under the second count was not voluntary.   His right to recover under the first count was not passed upon by the trial court.

The judgment must therefore be set aside and a new trial ordered, with costs to defendant.

FELLOWS, C. J., and WIEST, MCDONALD, CLARK, BIRD, MOORE, and STEERE, JJ., concurred.