LEHIGH VALLEY RAILROAD COMPANY ET AL., APPEL-
LANTS, v. MAAS & WALDSTEIN COMPANY, RESPOND-
ENT.

Argued July 2, 1923—Decided March 3, 1924.

1. The federal legislation under which the president was empowered
   by congress to take over the railroads of the country and
   operate them as governmental instrumentalities for war purposes
   invested the president with the power to fix rates for trans-
   portation, and such rates when filed with the interstate com-
   merce commission fixed the terms of transportation for both
   state and interstate commerce.

2. An agent of a railroad which had been taken over and was being
   operated by the federal government in time of war had no
   authority to accept or to propose to a shipper any other rate
   for the transportation of goods than that fixed by the tariff
   filed with the interstate commerce commission in pursuance of
   the act of congress, which authorized the federal operation of
   such railroads.

On appeal from the Supreme Court.

For the appellants, *McCarter & English*.

For the respondent, *Lindabury, Depue & Faulks*.

The opinion of the court was delivered by

MINTURN, J.    During the months of July and August,
1919, the Lehigh Valley railroad was taken over by the presi-
dent of the United States, and was operated as a common
carrier in government possession by the director general of
railroads, pursuant to the provisions of the war-time legis-
lation of congress enacted for that purpose.

During that period the former director general of railroads caused to be carried over the road eighteen carloads of wet nitro-cellulose, from the city of Newark to Nixon, in this state. The published tariff rate for such material between these points was twenty-five cents per hundred weight, upon which the defendant paid but nine cents per hundred weight, and refuses to pay the balance due thereon, amounting to $1,203.27, to recover which this suit was instituted. The defense interposed was substantially that the defendant obtained from an agent of the railroad the rate of nine cents, and made its shipment upon that quotation, which it would not have done had the published rate been exacted. The plaintiff replied that the agent had no authority to accept or to propose any other rate than that specified in the published tariff, or to agree to carry the goods for a less rate.

The case was tried before the Circuit Court without a jury, upon a stipulation of these facts, and resulted in a judgment for the defendant from which the plaintiff appeals. The question presented for decision, it will be observed, is essentially one of law, viz., whether an agreement of the governmental agent, under the circumstances, can bar the government from collecting from the defendant the freight due to the government at the regular published rate. Upon reasons of public policy it was comparatively at an early period in this state, declared to be unlawful, for a common carrier to create a preference in favor of a shipper. *Messenger* v. *Pennsylvania Railroad Co.,* 37 *N. J. L.* 531; *affirming,* 36 *Id.* 407.

This public policy was emphasized by the federal legislation under which the president was empowered by congress to take over the railroads and operate them as government instrumentalities for war purposes. 419 *Comp. Stat.* 1916; 25 *Comp. Stat.* 1918.

These acts invested the president with the power to initiate rates by filing the same with the interstate commerce commission. This power was exercised by the director general of railroads in pursuance of the power conferred upon the president, and the rates thus fixed became final and con-

trolling.   The rates so filed fixed the terms of transporta-
tion both for state and interstate commerce, and could not
be altered either by state action or *a fortiori* by the action
of any subordinate of the director general, who was, in this
instance, erroneously assumed the right and power to alter
rates to the disadvantage and loss of the government. *North-
ern Pacific Railroad Co.* v. *North Dakota, 250 U. S.* 135.

In Massachusetts the rule has been declared, in a substan-
tially similar situation, to be that "the railroad and the ship-
per are bound inexorably to follow the rate published.   No
excuse which operates as an invasion of that rate has any
standing as a matter of law in defense of a proved violation
of such rate.   Mistake, inadvertence, honest agreement and
good faith are alike unavailing."   *New York, New Haven,
&c., Railroad Co.* v. *York & Whitney Co.,* 102 *N. E. Rep.*
366.

The same rule was applied by our Supreme Court in *Dela-
ware, Lackawanna and Western Railroad Co.* v. *Nuhs Co.,* 93
*N. J. L.* 309, where the language of the federal court in
*Illinois Central Railroad Co.* v. *Hoopes et al.,* 233 *Fed. Rep.*
135, is cited, viz.: "So important was it that the collection
of freight charges should be uniform as to all shippers, so im-
portant is it that it be above suspicion of favoritism, that it
is against public policy to permit a counter-claim of this
kind to be pleaded" against the governmental claim for
unpaid rates.

This doctrine was enforced as the controlling rule under
the interstate commerce acts, where the federal government
undertook to exercise its constitutional prerogative relative
to transportation between the states; and the same principle
of public policy must be held to supervene in the situation
*sub judice,* where the federal government under legislation
of the congress assumes to operate the highways of transpor-
tation for all purposes, both interstate and intrastate.   The
test under this legislation is governmental operation and
control, and once that aspect is given to the situation, state
lines disappear, and the constitutional prerogative of the
federal government, not only to regulate commerce between

the states, but as well as to establish post-roads, and, above all, to preserve the integrity of the nation in a period of public danger, requires that the uniform and universal control of these vast arteries of travel and trade be maintained as a co-ordinate integral unit within as well as without the boundaries of each state; for, as was declared in *Northern Pacific Railway Co.* v. *North Dakota, supra,* "to the extent that any conflict arises, the state power is limited, since in case of conflict that which is paramount necessarily controls that which is subordinate."

In this instance the war power exercised by the president under the provisions of the acts of congress was paramount to existing state legislation, and superseded during the continuance of the national agency all state power inconsistent with the full and complete exercise of the federal law, as well within as without the states, and furnished the only controlling legal regulation for transportation wherever throughout the Union the power was exercised.

For these reasons the judgment appealed from will be reversed, and a *venire de novo* awarded.

*For affirmance*— None.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, TREN-CHARD, PARKER, MINTURN, KALISCH, BLACK, KATZENBACH, VAN BUSKIRK—9.