## DAVIS v. FERGUSON

(February 2, 1931.  Opinion and Decree.)
(March 2, 1931.  Rehearing Refused.)
(March 30, 1931.  Writs of Certiorari and Review·Granted by Supreme Court.)
(June 22, 1931.  Opinion and Decree of Supreme Court.)

$878.50 demurrage charges alleged to have accrued upon seven carload shipments of hay during the months of April, May, and June of 1918.

The defendant first entered a plea of prescription, which was sustained by the district court, and the suit dismissed. On appeal to this court, the judgment was reversed on April 30, 1925, and the plea of prescription overruled, and the case remanded to the lower court for further proceedings.

The defendant admits the shipments, but denies that there was any demurrage due by him, because: First, the tariffs on which the plaintiff brought the suit does not provide for demurrage or storage on cars loaded with hay and consigned to dealers in New Orleans, unless and until the cars are unloaded; second, that there is no allegation, evidence, or proof that notice of the arrival of the cars consigned to the defendant was given to him in writing; third, that there was no delivery of the cars to defendant, which was a condition precedent to the accrual of demurrage, because the cars were not unloaded in accordance with the universal custom and practice and also the standing instructions given to the railroad company by the hay dealers of New Orleans.

The record shows that, after the suit was filed and before its trial, Andrew W. Mellon was appointed as Director General of Railroads of the United States of America in place of James C. Davis; by appropriate motion and order entered in this cause, the name of Andrew W. Mellon was substituted for that of James C. Davis as Director General of Railroads and Agent of the United States, and as plaintiff in this cause, all in accordance with the acts of Congress governing such substitution.

Milling, Godchaux, Saal and Milling, of New Orleans, attorneys for plaintiff, appellant.

Bond, Curtis, Hall & Foster, of New Orleans, attorneys for defendant, appellee.

HIGGINS, J. This is a suit brought during December, 1922, by the Director General of Railroads, as Agent for the United States of America, against the defendant for the collection of the sum of

On the trial of the case on its merits, there was judgment dismissing plaintiff's suit, and plaintiff has appealed.

It is conceded by the defendant that the demurrage charges on the respective cars have been correctly figured and would be due the plaintiff if the defenses interposed are not well founded.

Taking up these defenses in the above order, we observe that on December 26, 1917, the President of the United States, in accordance with the power vested in him under an Act of Congress of August 29, 1916 (39 Statutes 645 [10 USCA sec. 1361]), by a proclamation took possession and assumed control of the railroad transportation systems of the United States. By this proclamation a Director General of Railroads was appointed with full authority to take possession and control of the railroads and to operate them. Northern Pacific Railway Co. v. North Dakota, 250 U. S. 135, 39 S. Ct. 502, 63 L. Ed. 897; Krichman v. United States (C. C. A.) 263 F. 538.

It appears from the record that prior to February 10, 1918, the demurrage tariffs, which were enforced in New Orleans, did not require that demurrage be assessed on carload shipments of hay shipped into New Orleans, but provided that, where cars could not be unloaded on account of crowded warehouse conditions, they be held subject to storage charges and not demurrage charges. This provision of the tariff conformed to a further tariff rule whereunder the railroads at New Orleans reserved to themselves the right to waive the requirement that carload shipments of freight be unloaded by consignees, and the right to unload such freight at the freight terminals of the railroads in the city of New Orleans for the purpose of expediting the release of equipment.

This tariff rule had been in existence for a considerable number of years prior to February, 1918, and New Orleans hay dealers had adopted the practice of giving the railroads standing orders to unload the hay in railroad warehouses, in accordance with the tariff, unless instructed to the contrary. Thus, under this tariff, cars containing hay were eliminated from the application of demurrage charges, and storage rates were made applicable instead.

On December 29, 1917, the Director General of Railroads issued General Order No. 7 to be effective February 10, 1918, the pertinent portion of which reads as follows:

"All carriers by railroads, subject to the jurisdiction of the undersigned, are hereby ordered and directed forthwith to publish and file, and to continue in effect until further order, tariffs in the form shown in the attached appendix, effective February 10, 1918, changed so as to provide:
"A (1) Forty-eight hours (two days) free time for loading or unloading, on all commodities.
"(2) Twenty-four hours (one day) free time on cars held for any other purpose permitted by tariff. * * *
"D. That the demurrage charge on all cars, after the expiration of the free time allowed, be $3.00 for each of the first four days, $6.00 for each of the next three days, and $10.000 for each succeeding day. * * *
"These charges will supersede all those named in any existing tariffs applicable to carload freight except (here follows a list of exceptions but car load shipments of hay were not included among same). * * *"

After providing for these exemptions, we find this language:

"And specifically contemplate the cancellation of all conflicting provisions of existing tariffs."

Nowhere in the general order or the appendix thereto are carload shipments of

hay excepted from the operation of the demurrage tariff.

On February 7, 1918, the carriers issued Joint Demurrage and Storage Tariff No. 1-C, which was "issued under special authority of the Railroad Commission of Louisiana, Order No. 2169, without formal hearing, in conformity with Order No. 7 of the Director-General of Railroads of the United States."

The provisions of Tariff No. 1-C, conformed to the requirements of General Order No. 7 and the appendix thereto, and the cars to which the demurrage tariff was applicable are listed in item No. 1, Rule No. 1, of the Tariff, as follows:

"Cars held for or by consignors or consignees for loading, unloading, forwarding directions, or for any other purpose, are subject to these Demurrage Rules, except as follows. * * * *"

An examination of the exceptions provided shows that carload shipments of hay are not included in them.

We further find in this tariff item No. 13, rule No. 1, dealing with freight subject to the rules, section B of which provides:

"Section B—Other carload freight held in cars for delivery and subsequently unloaded in or on railroad premises is subject to demurrage rules while in cars and to these storage rules after it is unloaded."

After a careful examination of the record, we have reached the conclusion that Tariff No. 1-C conforms to the General Order No. 7, and eliminates those provisions of the earlier tariff, effective prior to February 10, 1918, whereunder carload shipments of hay arriving in New Orleans could be retained in cars subject to storage and not demurrage charges.

From the record it further appears that all of the cars upon which demurrage is claimed arrived in New Orleans subsequent to February 10, 1918, and on April 30, 1918, were still in the possession of the railroad and still loaded.

On April 29 or 30, 1918, there was posted on the bulletin board of the Board of Trade, at New Orleans, a notice calling attention to the fact that demurrage would be charged on hay under the tariffs. The demurrage charges here sought to be collected were in each case calculated from April 30, 1918, storage charges having already been collected, on the cars up until that date from the defendant.

The jurisprudence is clear on the law of carriers that they cannot collect any other transportation charges than those provided for by the tariffs in force. It is likewise true that carriers must collect the tariff charges, and no error in failing to collect the legal transportation charges at the time of shipment or delivery will excuse the carrier from collecting the deficiency, or relieve the shipper from paying it, and any special contract between the carrier and the shipper which would seek to modify the obligation imposed by the tariff is illegal, as the tariff itself is the contract between the parties and is the only contract that the law will regard. Atchison, Topeka & Santa Fe R. Co. v. Robinson, 233 U. S. 173, 34 S. Ct. 556, 58 L. Ed. 901; Vandalia Railroad Co. v. United States (C. C. A.) 226 F. 713.

As a further corollary to the principles above discussed, it is likewise the law that a carrier may not offer any special service to any particular shipper or group of shippers which is not provided for by the tariffs. Chicago & A. R. Co. v. Kirby, 225 U. S. 155, 32 S. Ct. 648, 56 L. Ed. 1033, Ann. Cas. 1914A, 501.

These principles apply with equal force to demurrage tariffs as to freight tariffs, because demurrage is as much a part of the transportation charge as is freight. Davis v. Timmonsville Oil Co. (C. C. A.) 285 F. 470.

In the light of the foregoing authorities and provisions of the tariff, we are of the opinion that the first defense is without merit.

The second defense is that the plaintiff failed to allege and prove that written notice of the arrival of the cars was given to the defendant. While it is true that the plaintiff failed to allege that written notice was given, nevertheless H. A. Hoffman and J. P. Chapron, plaintiff's witnesses, testified that notice of the arrival of the various cars on which demurrage was charged was given to the consignee. Hoffman testified from the original records, compiled in the ordinary course of business.

The defendant, on cross-examination, admitted that he was actually aware of the arrival of the cars and paid storage charges for part of the time during which they remained in New Orleans, and that the company's agent was every day insisting that delivery of the cars be accepted and that they be unloaded.

It further appears that defendant's sole objection to paying the demurrage charges was that the demurrage and not the storage rate was charged. In his letter to the carrier, defendant did not register any objection to the demurrage bills on the grounds of lack of proper notice of the arrival of the cars. It therefore appears that the defendant had not only notice but actual knowledge of the arrival of the cars, and hence we believe the second defense is not well founded.

Passing to the third defense that demurrage was not due because the cars were not delivered and unloaded in accordance with the universal custom and practice and standing instructions of the consignee that the cars be unloaded in the railroad's warehouses, it appears to us that as a matter of fact such a custom did not exist.

The practice of the railroad company in unloading the carload shipments of hay in its warehouses was authorized by the provisions of Tariff No. 1-B, section C of item No. 7, rule No. 7, which was a reissue of an earlier tariff in identical terms, and reads:

"Cars containing hay arriving at New Orleans, which on account of crowded condition of railroad warehouses cannot be unloaded, will be placed on team tracks, subject to the following charges based on the weight of the contents, after expiration of free time."

This practice was further carried out under the provision of Freight Tariff No. 5691-A item No. 125, reading as follows:

"Item No. 125.
"Absorption of Charges.
"Loading and Unloading Carload Freight at New Orleans, Louisiana.
"Owing to the peculiar and congested conditions existing at New Orleans, La., the provisions of the classification with respect to owners being required to load and unload all freight in carloads may be waived, as follows, viz: Carload shipments consigned to parties at New Orleans, La., for delivery at Mo. Pac. R. R. depots or warehouses, and carload shipments originating at New Orleans, La., to be loaded in cars on Mo. Pac. R. R. loading tracks, the Mo. Pac. R. R. in order to expedite the releasing and handling of its equipment, reserves the right to load and unload such carload freight at its freight terminals in the City of New Orleans, La.
"This does not apply to shipments loaded or unloaded at Industry tracks."

While it is true that defendant clearly established by the testimony of several witnesses that it was the universal practice of the hay dealers in New Orleans to give the railroad companies standing orders to unload the hay in the railroad companies' warehouses, it is likewise clear that this method followed by the railroad companies was not required because of any obligation imposed by custom, but was the method expressly provided by the unambiguous provision of the tariff in force. The delivery of the cars and unloading of the hay having been done in accordance with the provisions of the tariff, it cannot be said that this is a case where a custom or usage has arisen that might be regarded as creating an implied obligation between the contracting parties, modifying the formal or express contract between them.

For these reasons we are of the opinion that the third defense must likewise fail.

For the reasons assigned, the judgment appealed from is annulled, avoided, and reversed, and it is now ordered that there be judgment in favor of Andrew W. Mellon, Director General of Railroads and Agent of the United States of America, plaintiff herein, and against Joseph V. Ferguson, defendant herein, in the full sum of $878.59, with interest at the rate of 5 per cent per annum on the following amounts from the following dates:

$ 3.09 from April 18, 1918
61.80 from May 21, 1918
185.40 from May 25, 1918
30.90 from May 8, 1918
133.90 from May 18, 1918
185.40 from May 27, 1918
278.10 from June 5, 1918

Defendant to pay the costs of both courts.

JANVIER, J., having been of counsel, takes no part.